UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| **LINDA KERN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CAUSE NO. 1:08-cv-454-WTL-TAB** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner** | ) | |
| **of the Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ENTRY ON JUDICIAL REVIEW

Pursuant to 42 U.S.C. § 405(g), Plaintiff Linda Kern seeks judicial review of the final

decision of the Commissioner of the Social Security Administration ("Commissioner") denying

Kern's application for Disability Insurance Benefits ("DIB") and Supplemental Insurance

Benefits ("SSI") under Titles II and XVI of the Social Security Act ("the Act").  The Court rules

as follows.

## PROCEDURAL HISTORY

Linda Kern filed her applications in April and May 2004, alleging disability beginning on

February 2, 2000, due to both physical and mental impairments. *Id.* at 62-66.  She complained

of depression, anxiety, panic disorder, mild mental retardation, back pain, leg weakness and

bilateral knee pain, gastroesophageal reflux disease ("GERD"), recurrent kidney stones, Diabetes

Mellitus, Type II ("diabetes"), and irritable bowel syndrome ("IBS"). *Id*. at 62-66, 95-101.  Her

application was denied initially and upon reconsideration, whereupon she requested a hearing

before an ALJ.  *Id.* at 50-51, 59.

On June 13, 2007, Kern, who was represented by counsel, appeared for a hearing before ALJ Peter C. Americanos. *Id.* at 1310-49. At the hearing, the ALJ heard testimony from Kern, medical expert Lloyd Stump, M.D., and vocational expert Robert Barber. *Id.* Two days after the hearing, Kern submitted additional medical records from Urology of Indiana in support of her claim of disability. *Id.* at 30, 245-49. Thereafter, on July 24, 2007, the ALJ rendered his decision in which he concluded that Kern was not disabled under the terms of the Act. *Id.* at 29-45. On February 7, 2008, the Appeals Council denied review of the ALJ's decision.[1] *Id.* at 4-7.

## **MEDICAL HISTORY**

In April 2004, Kern was diagnosed with cervical cancer by Katherine Y. Look, M.D. R. at 130-31. A few days later, she saw Higinia Cardenes, M.D., Ph.D., who recommended intra-cavity medication implants. *Id.* at 365. In May 2004, Kern's chest x-rays were normal, as was her colonoscopy, except for the presence of internal hemorrhoids. *Id.* at 248, 254. Also in May 2004, Kern was diagnosed with new-onset diabetes by Dr. Conrad. *Id.* at 416.

Kern underwent the surgery for cervical cancer in June 2004, followed by a course of radiation treatment. *Id.* at 131, 365, 376, 378, 386. In August 2004, Dr. Cardenes noted that

---

[1]After the ALJ's decision, Kern submitted additional evidence (Exhibits N-R) which was made part of the record by order of the Appeals Council, including a letter and medical records from Dr. Christopher Conrad dated May 2007 - November 2007, as well as medical records from Urology of Indiana (dated February 2007 - June 2007), St. Francis Hospital (dated July 2007 - November 2007), and Bartley Orthopedics, P.C. (dated August 2007). While this evidence deals with medical treatment that occurred after the date of the ALJ's decision and thus may not be considered by this Court in its review of that decision, the Court may consider it to determine whether remand is appropriate under sentence six of 42 U.S.C. § 405(g). *See Eads v. Sec'y of Health and Human Servs.*, 983 F.2d 815, 817-18 (7th Cir. 1993) (sentence six remand possible only when evidence is new, material, and good cause is shown for not submitting the evidence sooner). Kern has not requested such a remand, however, and the Court's cursory review of the new evidence has revealed nothing that would support such a remand.

2

Kern was cancer-free, but that she was still very fatigued from treatment.  *Id.* at 387.  By late

2004, Kern's cancer was in complete remission.  *Id.* at 127-28, 209-10, 214-15.

In July 2004, Kern saw Ziad Issa, M.D., at the request of the state agency.  *Id.* at 297-

300.  Kern reported that the follow-up chemotherapy for her cervical cancer made her nauseous.

*Id.* at 297.  She also described frequent episodes of dizziness that occurred daily and lasted for a

few minutes at a time.  *Id.* at 298.  Dr. Issa noted Kern had a normal gait and station, all joints

had full range of motion, and she had normal grip strength and fine finger manipulation.  *Id.*

In August 2004, Kern saw Nancy Ingwell, Ph.D., at the request of the state agency for a

mental status exam, memory testing, and I.Q. testing.  *Id.* at 284-89, 291-96.  During testing,

Kern was unable to identify the similarities and differences between an orange and a banana or a

dog and a lion.  *Id.* at 286.  On the Wechsler Adult Intelligence Scale, she scored a verbal I.Q. of

56, a performance I.W. of 55, and a full scale I.Q. of 51.  *Id.* at 287.  Dr. Ingwell diagnosed

"panic disorder, without agoraphobia," "depressive disorder, recurrent, severe," and "mild

mental retardation," and she assigned a GAF score of 55 (typically moderate symptoms, but

described by Dr. Ingwell to be "serious" symptoms).  *Id.* at 288-89.  However, Dr. Ingwell also

noted that the validity of the test was "somewhat questionable," observing that Kern had

difficulty understanding instructions and that her depression possibly hampered her from

attempting the tasks.  *Id.* at 287.

In October 2004, J. Gange, Ph.D., reviewed Kern's records for the state agency.  *Id.* at

256-59, 261-74.  In considering the "B" criteria of the mental impairment listings, Dr. Gange

opined that Kern had mild restriction of activities of daily living, moderate difficulties in

maintaining social functioning, moderate difficulties in maintaining concentration, persistence,

or pace, and no episodes of decompensation.  *Id.* at 271.  Of the twenty areas of work-related

3

functions, Dr. Gange found either no evidence of a limitation, no significant limitations, or only moderate limitations in all areas. *Id.* at 256-57. She concluded that Kern retained the ability to perform simple, repetitive tasks. *Id.*

Also in October 2004, Kern had a follow-up with Dr. Look for her radiation therapy. Dr. Look reported that Kern's fatigue had lessened, she had no fever, and she was able to sleep at night. *Id.* at 127-28, 209-10, 214-15.

In December 2004, Kern saw Stephen Harrold, M.D., and reported that she had problems with mood swings, easy crying spells, and difficulty concentrating. *Id.* at 418. Dr. Harrold noted that Kern's Prozac was helping her "quite a bit." *Id.* Kern also reported to counselor Ray Bigler that her medications had decreased the frequency of her panic attacks and her symptoms were "greatly improved." *Id.* at 155. That same month she saw Becky C. Doran, M.D., who reported that a recent skin biopsy was negative and there was no evidence of melanoma. *Id.* at 125, 237.

In January 2005, Kern saw Scott Levine, M.D., who noted depression and panic attacks and prescribed Prozac and counseling; he also noted a GAF score of 55 (moderate symptoms). *Id.* at 146-48, 170-75. Kern again returned to Dr. Look and reported some shortness of breath on exertion, which resolved with rest. *Id.* at 340. Dr. Look explained to Kern, who was six months out from radiation therapy, that she would benefit from weight loss, but otherwise advised her that she was "disease free." *Id.*

In February 2005, Kern returned to Dr. Harrold, who noted that Kern was not taking her medication for her IBS. *Id.* at 420. Knee x-rays revealed some mild left knee arthritis and a right knee within normal limits. *Id.* Dr. Harrold subsequently suggested weight loss and physical therapy for her knee pain. *Id.* at 420, 499. Additionally, F. Kladder, Ph.D., reviewed

4

Kern's records for the state agency that month and affirmed without comment Dr. Gange's

October 2004 assessment that Kern retained the ability for simple, repetitive tasks.  *Id.* at 259.

In May 2005, Kern saw Dr. Harrold once again.  He noted that Kern was "an extremely

difficult historian" and that he could not make enough sense out of her history to make a

diagnosis.  *Id.*  Kern felt that she had pneumonia; however, Dr. Harrold observed that Kern had

no cough and no shortness of breath.  *Id.*  She reported feeling thirsty all the time and that she

felt she was being poisoned because her mouth was dry and she had a "strange"sensation on her

lips.  *Id.*  Later in May 2005, Dr. Harrold noted that Kern had recently been diagnosed with

diabetes.  *Id.* at 426.  When Dr. Conrad observed that Kern's diabetes was poorly controlled, he

advised a home health care aid to help Kern learn to give herself insulin shots.  *Id.* at 505-20.  By

the end of May 2005, she was able to administer her own shots.  *Id.* at 519.

In July 2005, Kern returned to Dr. Look, who noted that Kern was thirteen months out

from completion of her radiation treatment and that she was "doing well" and was "free of

disease."  *Id.* at 344.

In September 2005, Kern saw Dr. Conrad with complaints of tingling and burning in her

legs and feet.  *Id.* at 438.  The differential diagnosis for the pain included degenerative joint

disease of the spine versus spinal and/or sacral fracture versus metastatic recurrence of cervical

cancer.  *Id*.  Kern also saw Samuel Thompson, M.D., in September 2005 on a visit to the

emergency room with complaints of kidney stones, her first episode of renal colic.  *Id.*  at 475.

A CT scan was performed which revealed that Kern's primary stone had resolved, but she had

other stones.  *Id.* at 476-78.  Dr. Thompson also explained that the radiologist had determined

that Kern had a mild stress fracture in her right sacral area, and the two doctors felt that this was

the cause of her pain.  *Id.* at 476.  There were degenerative changes in the sacroiliac joints and a

moderate degree of lumbar spondylosis and degenerative arthritis.  *Id.*

In October 2005, Kern returned to Dr. Look for a follow-up of her cervical cancer.  *Id.* at

393.  She reported that she was "doing and feeling very well," and Dr. Look found no evidence

of recurrent disease.  *Id.*  In November 2005, Kern saw Robert S. Bond, M.D., who prescribed

medication for Kern's diabetes, as well as cholesterol medication.  *Id.* at 347, 350.

In December 2005, a repeat CT scan revealed stable lumbar spondylosis and bilateral

sacroiliac degenerative joint disease.  *Id.* at 352, 524-26.  Kern's neck CT was normal, with the

exception of an abscessed molar, and her head CT scan was normal.  *Id.* at 353-54.  Kern visited

Dr. Thompson with complaints of right-side back pain, rating her pain level a ten on a scale of

one-to-ten.  *Id.* at 440.  Dr. Thompson explained that Kern had a stress fracture of her sacroiliac

joint, which resulted in her back pain, so he prescribed Vicodin and referred her to Charles

Bartley, Jr., M.D, an orthopedics specialist.  *Id.*

In December 2005, Kern saw Dr. Bartley.  She complained of pain radiating down into

her leg to about the knee level that was worse with activity.  *Id.* at 412.  Dr. Bartley was unable

to assess Kern and could detect no weakness in her legs; she seemed to have good sensitivity and

good range of motion about her hip.  *Id.*  A lumbar MRI scan revealed a central disc protrusion

with mild spinal stenosis, and Dr. Bartley prescribed Lortab for her back pain.  *Id.* at 524-26.

Dr. Bartley again saw Kern in January 2006, at which time Kern complained of

continued back pain and a burning sensation in her feet.  *Id.* at 412, 443.  Upon examination, Dr.

Bartley noted Kern had significant degenerative disease with spinal stenosis.  *Id.*  He then

prescribed facet block injections, weight loss, and anti-inflammatory and pain medication.  *Id.*

Also in January 2006, Kern returned to Dr. Conrad, who noted that Kern's depression was stable

on Zoloft.  *Id.* at 446.  She saw Dr. Bond for follow-up for diabetes and reported low back pain, which was being treated by Dr. Bartley.  *Id.*  She also had a dermatology check-up because she had previously had skin cancer removed; no new lesions were found.  *Id.* at 358.

In February 2006, Kern visited Dr. Conrad and reported that her blood sugar readings were relatively well-controlled, her depression "very stable" on medication, and that she had no problems with appetite, sleep, anxiety, or depression.  *Id.* at 447.  In March 2006, Kern saw Dr. Conrad after experiencing two days of numbness and tingling in her left leg.  *Id.* at 449.  On examination, her gait was normal, as were her reflexes and strength.  *Id.*  Dr. Conrad advised Kern to return to Dr. Bartley for treatment of her back and leg pain.  *Id.* at 450.  Subsequently, Dr. Bartley recommended an epidural block.  *Id.* at 414.

In April 2006, Kern had a urethra stent placed to keep her urethra and bladder clear of obstruction.  *Id.* at 452, 537-42.  She continued to complain of right flank pain, so Dr. Sprunger prescribed medication to dissolve her remaining kidney stones.  *Id.* at 453, 480.  In May 2006, Kern was admitted to the hospital for a week for abdominal pain and treatment of her kidney stones.  *Id.* at 579-85.  Her stent had been giving her trouble and it was removed that month as well.  *Id.* at 606-07, 612.

In June 2006, Kern returned to Dr. Conrad and reported that her mood was better, her diabetes was under control, and her lower extremity pareshtesia was so mild that she took no medication for it.  *Id.* at 456.  When a CT scan revealed significant increase in the size of one of her kidney stones, Dr. Sprunger noted that the stones appeared to be uric acid stones and prescribed medication to dissolve them.  *Id.* at 457-58, 480-83.

In July 2006, Kern returned to Dr. Conrad, who noted that Kern had recurrent right kidney stones with a tube in place.  *Id.* at 461.  Later in July 2006, after complaining of

7

intermittent fevers for two months and after medical staff noted her output from her

nephrostomy tube had recently increased, Kern was diagnosed with acute pyelonephritis (kidney

infection).  She underwent surgery and her tube was removed.  *Id.* at 633-40, 726-37.

In September 2006, Kern saw Mark Henderson, M.D., in follow-up for her cervical

cancer.  *Id.* at 396.  Kern reported low back pain, which radiated down her legs at a pain level of

ten on a scale of one-to-ten.  She was taking Vicodin, which helped relieve the discomfort.  *Id.*

In October 2006, Kern returned to Dr. Conrad with complaints of numbness and pain in

her left leg.  *Id.* at 464.  He assessed that Kern had signs of neuropathy in both feet with

decreased sensation, worse on the left lower extremity than the right; he prescribed Lortab for

the pain.  *Id.*  Kern also reported panic attacks with the extra stress of having her son at home.

*Id.*  Dr. Conrad recommended that Kern see someone in the psychiatric unit for medication

changes and coping mechanisms.  *Id.*  Also in October 2006, Dr. Conrad completed a

questionnaire on which he noted that Kern may have three side-effects from her medication:

weight-gain from insulin, muscle pain from Mevacor, and fatigue from Lortab.  *Id.* at 472-74.

In December 2006, Kern reported that her GERD was well-controlled with medication

and her depression and anxiety were under control with Klonopin and Zoloft.  *Id.* at 467.  In

January 2007, recurrent flank pain caused Kern to go to the hospital, where a CT scan revealed

additional kidney stones.  *Id.* at 798-99, 908.  In February 2007, Dr. Sprunger prescribed

medication and hydration.  *Id.* at 925-26.  Subsequently, in March 2007, Kern underwent another

surgical procedure to place a right-sided urethral stent.  *Id.* at 826, 927, 930-31, 939.  She also

made a trip to the emergency room with left lower quadrant pain.  *Id.* at 833-54.  A CT scan

revealed a left ureter stone for which Kern was proscribed Vicodin.  *Id.* at 851-54.

Kern, accompanied by her daughter, also saw April Faidley, Ph.D., in March 2007.  *Id.* at 335-39.  She reported that she slept twelve-to-sixteen hours a day and her adult daughter did all the household chores.  *Id.* at 336.  Her mood was depressed, but her speech was logical and sequential.  *Id.* at 337.  Dr. Faidley subsequently diagnosed Kern with major depressive disorder, panic attacks, dissociative disorder, and provisional dementia, and she assigned a GAF score of 40 (major functional impairments).  *Id.* at 335-39.

In April 2007, Kern returned to Dr. Conrad, who noted that Kern's blood sugar levels were under better control than in the prior few months.  *Id.* at 913.  Her hypertension was well-controlled without side effects.  *Id.*  A CT scan revealed the absence of stones, so Kern had her stents removed.  *Id.* at 894, 897-98, 902, 941-44.

In May 2007, Kern underwent a CT scan which revealed a tiny stone in the right ureter.  *Id.* at 882-894.  Dr. Sprunger then performed another stent placement to treat this new stone.  *Id.* at 943-44.  Kern returned to Dr. Conrad and explained that she had right and low back pain that had not resolved due to her recent kidney stone issues.  *Id.* at 914.  She reported instability at times and asked for a walker "for now" to help with her mobility, so Dr. Conrad prescribed the walker.  *Id.*  Finally, in June 2007, when a repeat CT scan revealed the absence of stones, Kern underwent a brief procedure to remove the stent.  *Id.* at 941.

## TESTIMONY AT THE ADMINISTRATIVE HEARING

Kern was forty-five years old at the time of the ALJ"s decision.  R. at 1315.  She had an eighth grade education, and prior to the onset of her alleged disability she was employed as a server and cashier.  *Id.* at 1317.

Kern surprised the ALJ when she arrived for her hearing in a wheel chair she said she had received the day before.  *Id.* at 1312-13.  Prior to the wheel chair, she testified to using a

walker for approximately five or six weeks.  *Id.* at 1335.  She testified that she needed the

assistive device for her back pain, which was the result of a fall at her mother's house in

September 2005.  *Id.* at 1313.  Six months after the fall she had seen Dr. Conrad, who then

referred her to Dr. Bartley.  She testified that Dr. Bartley told her that her bones were

deteriorating.  *Id.* at 1313, 1318.  When asked what her pain level was on a scale of one-to-ten

while on her pain medication, Kern testified to an average of eight.  *Id.* at 1319.  She testified

that her back pain level during the hearing was a ten (ten being extreme pain requiring one to go

to the emergency room).  *Id.* at 1320.  Kern also testified that she could probably sit for about

four minutes, stand about one minute, walk approximately ten feet and only lift a jar of

mayonnaise, or approximately a pound.  *Id.* at 1321.

      Additionally, Kern testified to a number of other mental and physical health problems.

She testified that she had suffered from neuropathy since 2006 and also had had "a lot of kidney

stone problems and surgeries."  *Id.* at 1315.  Kern testified that the kidney stones had caused her

back problems over the past two years.  *Id.* at 1329.  She was taking potassium citrate to help

prevent the stones; however, she continued to have stones and saw Dr. Sprunger at least once a

week.  *Id.* at 1330.

      She testified that her diabetes had been diagnosed about two years earlier.  *Id.* at 1330.

She was on multiple medications and tested her blood sugar, which she said was "out of

control."  *Id.* at 1331.  She also testified that she had suffered from IBS for the prior two years,

and that she had to go to the bathroom at least twenty times a day.  *Id.* at 1323.

      Kern also claimed to have suffered memory loss over the past two years.  *Id.* at 1325.

She said she had problems remembering things that happened the day before, but not things that

happened a long time ago.  *Id.* at 1336.  When the ALJ asked Kern to recount her activities from

the day before, Kern recalled that she saw Dr. Sprunger at 10:00 a.m. for an appointment concerning her kidney stones.  *Id.* at 1327.  After the appointment, she returned home and went to bed because she was sick and had stayed up the night before with diarrhea and nausea.  *Id.* at 1328.  She slept and only got up to go to the bathroom (approximately eighteen times), have dinner and watch Wheel of Fortune.  *Id.*

Kern also testified concerning her cancer.  She was in remission but claimed to suffer the continued effects of diarrhea.  *Id.* at 1325-26.  She also testified that she had skin cancer "all over her legs and arms."  *Id.* at 1326.

Finally, Kern testified that her medicine controlled her panic attacks, but she cried every day because of her health problems and she had anger issues, which caused her to "go off" "every now and then."  *Id.* at 1333-34.  However, she said she was not in therapy due to her other physical health problems that had her going to doctor appointments every day.  *Id.* at 1332.

After Kern concluded her testimony, the ALJ heard testimony from Dr. Stump.  *Id.* at 1338-44.  Dr. Stump noted that Kern's kidney stone problem started in September 2005 and that she had considerable problems up until July 2006, which was the last date for which he had records concerning that issue.  *Id.* at 1339.  However, he commented that Kern had probably had had at least two more episodes of renal stones since July of 2006, and new information and her testimony at the hearing seemed to indicate to him that the problem had not been resolved.  *Id.*

Dr. Stump also testified concerning Kern's back pain.  *Id.*  He noted an MRI which showed mild spinal stenosis, but there was nothing in the charts about the deterioration Kern complained of and no new records to that effect.  *Id.*  Furthermore, Dr. Stump said he had been unaware that Kern was in a wheelchair.  *Id.*  When it was brought to his attention that Dr. Conrad

11

had prescribed a cane for Kern for her recurrent kidney stones, Dr. Stump testified that he could see no reason to prescribe a cane for that purpose.  *Id.* at 1344.

With regard to her cancer, Dr. Stump noted that Kern had been treated for cervical cancer; she had done well and was in remission.  *Id.* at 1339.  He also noted her history of malignant melanoma removed from her eyebrow area in 1995.  *Id.* at 1339-40.

Dr. Stump then reviewed a clinical report from December 2006.  *Id.* at 1340.  The report indicated the following:  Kern was in remission from cervical cancer; her depression and anxiety seemed to be under control with Clonopine and Zoloft; Neurontin had helped her parashthesias; she had some numbness and tingling in her extremities secondary to her diabetes; her diabetes had not been well-controlled, but there had not been any acidosis; her blood pressure had been well-controlled; her gait overall was normal, although slowed by the fact that she had some low back pain which was worse with extending the legs; her straight leg raising for radiculopathy was negative; her deep tendon reflexes were equal and strength was good at 5/5; and her GERD was controlled with Nexium.  *Id.*

Dr. Stump also testified that he had not seen anything regarding neuropathy in the reports, except a reference that Kern had been placed on Neurontin for parasthesia.  *Id.* at 1340.  Dr. Stump clarified that "parasthesias are the first symptoms of neuropathy, and they're usually just the tingling, burning, and numb feeling, although there's no numbness and no loss of muscle power at that stage."  *Id.* at 1340-41.

Finally, Dr. Stump evaluated Kern's residual functional capacity to be at the light level because of an indication of some low back problems since 2005; "but it did not seem to be that great at the time."  *Id.* at 1341.  He also vocalized his concern that Kern had a lot of illness

12

associated with her kidney stones and that she had to see doctors very frequently because of them. *Id.*  However, he concluded that no listings were met or equaled under the Act. *Id.*

After Dr. Stump finished his testimony, the vocational expert ("VE") testified. *Id.* at 1344-48.  The VE classified Kern's past work as a cashier as light, unskilled and as a server as light, skilled. *Id.* at 1345.  The ALJ asked the VE to consider a hypothetical individual with Kern's age, education, and work experience who could perform light work restricted to simple and repetitive tasks, but who must avoid slippery or uneven surfaces, and be permitted one day off per month. *Id.*  The VE testified that such an individual could perform Kern's past work as both a server and a cashier. *Id.*  The VE also testified that the hypothetical individual's skills transferred to a housekeeper for which there were 2,250 positions in the State of Indiana and an assembler with 3,940 positions.  At the sedentary level, the VE testified that such a hypothetical individual could work as a telephone quotation clerk (1,925 positions), paramutual ticket checker (1,460 positions), or security guard surveillance monitor (260 positions). *Id.* at 1346.  The VE's answer did not change when the ALJ added the limitation that Kern must avoid work at unprotected heights and around dangerous, moving machinery. *Id.*  However, he did testify that a person who could only sit or stand for ten minutes before having to change positions and with very limited mobility would not be able to perform such work. *Id.* at 1346-47.

## **STANDARD OF REVIEW**

To be eligible for DIB and SSI, a claimant must have a disability under 42 U.S.C. § 423.[2] "Disability" means the inability to engage in any substantial gainful activity by reason of any

---

[2] The DIB and SSI regulations are codified independently, but due to the fact that the definition of "disability" and the applicable five-step process is essentially identical under both standards, reference will only be made to the regulations relating to DIB.

13

medically determinable physical or mental impairment that has lasted or can be expected to last

for a continuous period of not less than twelve months.  *See* 42 U.S.C. § 423(d)(1)(A).  The

standard is a stringent one.  The Act does not contemplate degrees of disability or allow for an

award based on partial disability.  *See Stephens v. Heckler,* 766 F.2d 284, 285 (7th Cir. 1985).

When determining whether a claimant is disabled, an ALJ applies the five-step process set forth

in 20 C.F.R. § 404.1520(a)(4):

1. Is the claimant engaging in substantial gainful activity?  If so, she is not disabled.

2. If not, does the claimant have an impairment or combination of impairments that are severe?  If not, she is not disabled.

3. If so, does the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant is disabled.

4. If not, can the claimant do her past relevant work?  If so, she is not disabled.

5. If not, can the claimant perform other work given her residual functional capacity ("RFC"), age, education, and experience?  If so, then she is not disabled.  If not, she is disabled.

The burden of proof is on the claimant for the first four steps and then shifts to the

Commissioner at the fifth step.  *See Young v. Barnhart,* 362 F.3d 995, 1000 (7th Cir. 2004).

The Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the

Commissioner's denial of benefits.  When the Appeals Council denies review of the ALJ's

findings, the ALJ's findings become the findings of the Commissioner.  *See, e.g.*, *Smith v. Apfel,*

231 F.3d 433, 437 (7th Cir. 2000).  This Court will sustain the ALJ's findings if they are

supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Scheck v. Barnhart,* 357 F.3d 697,

699 (7th Cir. 2004).  In reviewing the ALJ's findings, the Court may not decide the facts anew,

reweigh the evidence, or substitute its judgment for that of the ALJ.  *See id.*  While a scintilla of

evidence is insufficient to support the ALJ's findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning." *Diaz*, 55 F.3d at 307. In other words, the ALJ must clearly articulate his analysis of the evidence, building an accurate and logical bridge from the evidence to his conclusion. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). An ALJ's articulation of his analysis "aids [the Court] in [its] review of whether the ALJ's decision was supported by substantial evidence." *Scott v. Heckler*, 768 F.2d 172, 179 (7th Cir. 1985).

## ANALYSIS

The ALJ in this case found Kern not disabled at steps four and five of the sequential evaluation process. *See* R. at 42-43. At step one, the ALJ found that Kern was not engaged in substantial employment. *See id.* at 31. At steps two and three, the ALJ concluded that Kern had the following severe impairments: kidney stones, status post cervical cancer, diabetes, obesity, depression/anxiety, GERD, paresthesia, and back impairment. However, the ALJ determined that those impairments did not meet or medically equal a listed impairment. *See id.* at 31-32. At step four, the ALJ concluded that Kern retained the RFC to perform light work with the

following restrictions:  she should avoid walking on slippery or uneven surfaces or working at

unprotected heights and around dangerous moving machinery; she needed one day off from

work a month; and her work should be simple and repetitive.  *See id.* at 39.  Finally, at step five,

the ALJ found that given Kern's RFC, age, education, and experience, she was capable of

performing a significant number of jobs in the national economy.  *See id.* at 43.  Based on the

foregoing analysis, the ALJ determined that Kern was not disabled.  *See id.*

### The Tone of the ALJ's Questioning

As an initial matter, the Court recognizes Kern's complaint that the ALJ conducted "an

unnecessarily aggressive examination" of her during the hearing and acknowledges her request

that the Court review the audio tape of the hearing rather than simply reviewing the transcript "in

order to appreciate the tone of the proceedings and the diminished capacity of the Plaintiff to

cope and respond."  In fact, the ALJ's impatience with Kern is obvious from the transcript.  The

hostile manner in which the ALJ phrased some of his questions and the way in which he

frequently interrupted Kern as she attempted to answer him, obviously flustering her, was

inconsistent with the non-adversarial nature of the proceeding.  *Cf. Nelson v. Apfel*, 131 F.3d

1228, 1236 (7th Cir. 1997).  The ALJ is reminded that his duty is to develop a full and fair record,

and treating the claimants who appear before him with respect is a necessary aspect of that

process.

### Kidney Stones

Kern challenges the ALJ's RFC determination, contending that the ALJ illogically and

erroneously determined that Kern could do light level, simple and repetitive work.  A light RFC

restricts the claimant to lifting no more than 20 pounds at a time, with frequent lifting or carrying

of objects weighing up to 10 pounds.  It also requires a good deal of walking or standing.  *See* S.S.R. 83-10.

Kern argues that the ALJ erred in his consideration of the effect of Kern's ongoing battle with recurrent kidney stones.[3]  The Court agrees.  In his RFC determination, the ALJ expressly stated that he gave controlling weight to Dr. Stump's assessment.  *See* R. at 39.  However, as Dr. Stump himself acknowledged in this testimony, his assessment was based on incomplete information.  Specifically, Dr. Stump testified as follows:

> The renal stone problem started in September of '05, and she had considerable problems between that time and July of '06 when they finally got everything cleaned out.  And during this time, she even had to have a tube from the kidney out to her skin to empty the kidney because of so many stones in the urethra.  But I think since July of '06, and I don't think I have all of the records, she's probably had two more episodes of renal stones.  I know she went back in July again and then recently was some new information I just received.  She'd had more renal stones.  And what all they've had to do, I don't know.  Frequently they'll go in and break them up from below and get them out.  And she is on medication for this. . .  And there was a lot of illness associated with these kidney stones.  I mean, she's right, she's had to see doctors very frequently because of that.

*Id.* at 1339-40.  In other words, Dr. Stump acknowledged that Kern had suffered significant symptoms–and had required very frequent doctor visits, as well as several hospitalizations–as a result of her kidney stones prior to July 2006, and he further acknowledged that he did not have sufficient information to determine the extent of the kidney stone problems she had suffered in the 13 months between July 2006 and the hearing.  The ALJ translated Dr. Stump's testimony into the following finding:

> With regard to her kidney stones, Dr. Stump testified she had considerable problems beginning in September 2005 until July 2006 when they got everything

---

[3]The Court notes that Kern's kidney stone problem began after her date last insured, and therefore is relevant only to her application for SSI.

17

cleaned out.  A CT scan on September 14, 2006, revealed no calculi involving the urinary system.  She developed further stones requiring stent placement.

*Id.* at 41.  The ALJ also noted that "the claimant has indicated that when the stones pass, she is much more comfortable."

As an initial matter, Dr. Stump's testimony is a bit misleading, as it suggests that as of July 2006 Kern's kidney stone issue that became the previous September was completely resolved.  In fact, Kern was hospitalized and underwent surgery related to her kidney stones on July 31, 2006.  A follow-up procedure performed on August 9, 2006, indicated that she had "an obstruction at the level of the mid right ureter with no flow seen into the bladder."  R. at 738, The following day, she underwent a procedure to have a previously inserted right nephrostomy catheter removed.  Thus, Kern's kidney stones caused her problems well into August 2006. More importantly, however, the medical records that were not considered by Dr. Stump show that she was back in the hospital in January 2007 with more kidney stone issues.  These problems essentially continued through the date of the hearing and beyond, requiring numerous doctor visits and procedures–essentially a repeat of what had happened in 2005-06.  *See id.* at 826, 927, 930-31, 939, 941, 943-44.  The ALJ's banal statement that "she developed further stones requiring stent placement" belies the seriousness of what Kern experienced during her kidney stone episodes, which is evidenced by Dr. Stump's testimony upon which the ALJ purported to rely.  It was error for the ALJ to completely ignore the effect of her recurring kidney stones and resulting complications–including the pain involved as well as the time spent visiting physicians, having procedures done, and recovering from those procedures–on her ability to perform substantial gainful activity.  Remand therefore is required for the

18

ALJ–preferably with the aid of a medical expert–to consider all of the evidence regarding Kern's kidney stone impairment.[4]

### *Pain Unrelated to Kidney Stones*

Next, Kern suggests–without much elaboration–that the ALJ failed to take into consideration her back pain and difficulty walking. To the extent that Kern is referring to back pain and mobility issues independent of her kidney stones,[5] the Court disagrees. The ALJ expressly noted that Kern reported shortly before her hearing, on March 13, 2007, that her back pain had "more or less resolved," and examination on that date revealed that her gait was normal. *See* R. at 41, 912. She also told her physician that she had started a walking program, which suggested that both her back pain and her mobility had improved. *See id.* The ALJ also observed that there was no medically acceptable diagnostic imaging evidence of any impairment involving the upper extremities or the cervical spine to support Kern's testimony that she could only lift a jar of mayonnaise. *See id.* at 41. Consequently, the Court concludes that the ALJ's determination regarding Kern's back pain and mobility (independent of her kidney stones) is supported by substantial evidence.

### *Mental RFC Determination*

---

[4]The Court notes that the fact that Kern may experience some weeks or months of relief from kidney stones in between episodes does not necessarily prevent her from satisfying the twelve-month duration requirement. *See, e.g., Wilcox v. Sullivan*, 917 F.2d 272 (6th Cir. 1990). However, it is possible that the two bouts with kidney stones in the record before this Court were isolated events and that Kern's kidney stone issue has actually been resolved at this point. Depending on what updated medical records show, it likely will be necessary for the ALJ to seek the opinion of her physician and/or a medical expert regarding whether her condition is a permanent (or long-term) episodic condition.

[5]The record is clear that Kern experienced significant pain during her kidney stone episodes.

Kern suggests that the ALJ erred with regard to his consideration of her mental impairments.  Specifically, she argues that the hypothetical questions he posed to the vocational expert at the hearing failed to include the limitation that she could not interact appropriately with the general public.  However, the evidence of record did not dictate that the ALJ find such a limitation, and the Court determines that the ALJ's mental RFC is supported by substantial evidence.

In his decision, the ALJ gave greater weight to the assessment submitted by examining state agency physician, Dr. Ingwell, than to the report submitted by Dr. Faidley.  *See id.* at 38.  Dr. Ingwell diagnosed Kern with panic disorder without agoraphobia and depressive disorder, recurrent, severe.  *See id.* at 289, 296.  Alternatively, Dr. Faidley diagnosed Kern with the following:  major depressive disorder, recurrent, severe with psychotic features; panic attacks; dissociative disorder not otherwise specified; and dementia not otherwise specified, provisional.  *See id.* at 339.  However, to the extent that Kern seeks to rely on Dr. Faidley's report, the Court notes that it is the province of the ALJ to weigh the evidence in making his decision.  *See Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999).  In this instance, the ALJ gave Dr. Faidley's report less weight because the reported symptoms were not reported elsewhere in the record, and there were reports indicating that Kern's mental state improved on medication before and after the assessment.  *See* R. at 38.

In addition, the ALJ indicated in his opinion that the evidence did not corroborate Kern's claims as to the intensity, persistency, and limiting effects of her alleged mental deficiencies.  *See id.* at 40.  While the test results gathered by Dr. Ingwell may have indicated that Kern had some memory issues, Dr. Ingwell did not diagnose a corresponding disorder.  *See id.* at 284-89, 291-96. Additionally, Dr. Gange, who viewed the same results, only found that Kern had a moderate limitation in understanding, remembering, and carrying out detailed instructions.  *See*

*id.* at 256.  In addressing Kern's alleged inability to work with the public, Dr. Ingwell diagnosed

Kern with panic disorder "without agoraphobia," and Dr. Gange did opine that Kern had a

moderate limitation in her ability to interact appropriately with the general public.  *See id.* at 257,

289, 296.  However, Dr. Gange further opined that Kern, notwithstanding her moderate

limitations, retained the ability to perform simple, repetitive tasks.  *See id.* at 258-59.

Furthermore, various doctor reports also indicated to the ALJ that Kern's mental health issues

were adequately controlled on medication, and Kern had sought no counseling beyond a few

visits to an outpatient therapy clinic, which were discontinued in February 2005.  *See id.* at 38,

41, 1345.  Finally, the ALJ pointed to Dr. Conrad's notations that Kern had "normal insight,

orientation, memory and affect" on multiple occasions.  *See id.* at 46, 48-49, 52.  The ALJ

adequately explained the basis for his mental RFC determination, and that determination is

supported by substantial evidence.

     In addition, Kern argues that the ALJ should have called a mental health expert to review

Kern's mental health issues.  However, there was ample evidence on the record regarding Kern's

mental impairments, and the ALJ was well within his discretion to determine that a mental

health expert was not necessary in this case.  *See* 20 C.F.R. § 404.1527(f)(2)(iii); *Skarbek v.

Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

**CONCLUSION**

     For the reasons discussed at length above, this case is **REMANDED** to the

Commissioner for further proceedings consistent with this Entry.

     SO ORDERED:  07/10/2009

                                     _William T. Lawrence_

                                     Hon. William T. Lawrence, Judge
                                     United States District Court
                                     Southern District of Indiana

Copies to all counsel of record via electronic notification